# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

OLENA HALIM, individually and on
behalf of all those similarly situated,

   *Plaintiff,*

v.

CHARLOTTE TILBURY BEAUTY
INC. and
ISLESTARR HOLDINGS, LTD.

   *Defendants*

No. 23 CV 94

Judge Lindsay C. Jenkins

## MEMORANDUM OPINION AND ORDER

Plaintiff Olena Halim ("Plaintiff"), on behalf of herself and a proposed class of all those similarly situated, brings suit against Defendants Charlotte Tilbury Beauty Inc. ("Charlotte Tilbury") and Islestarr Holdings, Ltd. ("Islestarr") (collectively, "Defendants") for alleged violations of the Illinois Biometric Privacy Act ("BIPA") and unjust enrichment arising out of Plaintiff's and the proposed class members' use of Defendants' "Charlotte's Virtual Try On" tool. Defendants removed the case from state to federal court pursuant to the Class Action Fairness Act ("CAFA"). Currently before the Court is Plaintiff's motion to remand [Dkt. 29]. For the reasons explained below, the Court concludes that Defendants have not satisfied CAFA's $5 million amount in controversy requirement. Plaintiff's motion to remand [Dkt. 29] is therefore granted. This matter will be remanded to the Circuit Court of Cook County. Civil case terminated.

## I.     Background

Plaintiff is an individual who resides in Chicago, Illinois. Defendant Charlotte Tilbury, a Delaware corporation with its principal place of business in New York City, is a makeup and cosmetics company that sells its branded products online and in brick and mortar stores. Defendant Islestarr, a United Kingdom private limited corporation with its principal place of business in London, is Charlotte Tilbury's parent company.

On the Charlotte Tilbury website and in select stores, Defendants invite consumers to "virtually try on" Charlotte Tilbury cosmetic products such as lipstick, mascara, eyeliner, and blush. [Dkt. 1-1, ¶ 22.] A consumer accesses Charlotte's Virtual Try On tool by clicking a "TRY IT ON ME" hyperlink on the product page. A box appears that says, "WELCOME TO CHARLOTTE'S VIRTUAL TRY ON" and includes a button labeled "ALLOW CAMERA ACCESS." [*Id.* ¶ 26.] When the consumer clicks "ALLOW CAMERA ACCESS," Defendants use the consumer's camera to take a live scan of the consumer's face, which is then overlaid with the selected makeup product.

Charlotte's Virtual Try On tool uses a sophisticated and precise facial recognition technology called "Makeup AI™". Makeup AI™ uses a scan of the consumer's facial landmarks and facial geometry to create a "face template." [Dkt. 1-1, ¶ 31.] Each face template is unique to an individual and can be used to identify them. On information and belief, Islestarr owns and holds the trademark to Makeup AI™ and also owns the copyright for the Charlotte Tilbury website.

2

On several occasions between December 2020 and October 2022, Plaintiff visited the Charlotte Tilbury website and used Charlotte's Virtual Try On tool to see how Charlotte Tilbury cosmetic products would look if applied to her face. Plaintiff "virtually" tried on lipstick, lip liner, eye shadow, highlighter, and other cosmetics. To use the tool, Plaintiff was required to turn on and use her live camera so it could scan, capture, use and store digital copies of her unique facial geometry. Prior to capturing Plaintiff's biometric identifiers, Defendants did not inform Plaintiff that these identifiers were being captured, collected, stored, used, or disseminated. Nor did Defendant publish any policy concerning the retention or destruction of biometric identifiers.

Plaintiff filed suit against Defendants in the Circuit Court of Cook County on December 7, 2022, alleging that Defendants operated Charlotte's Virtual Try On tool in a manner that violates multiple provisions of BIPA. In Count One, Defendants allegedly violated BIPA subsection 15(a) because they "failed to develop a written policy, made available to the public, that establishes a retention schedule and guidelines for permanently destroying the biometric identifiers and/or biometric information of Plaintiff and Class members." [Dkt. 1-1, ¶ 37 (citing 740 ILCS § 14/15(a); see also *id.*, ¶¶ 56-62 (Count I).]

In Count Two, Plaintiff alleges that "Defendants never informed or disclosed to Plaintiff and Class members that it was capturing, collecting, and storing their biometric identifiers and biometric information," in violation of subsection 15(b)(1) of BIPA. [Dkt. 1-1, ¶ 32 (citing 740 ILCS § 14/15(b)(1)); that "Defendants never informed

3

Plaintiff and the Class members of the specific purpose and length of time for which Defendants were collecting, storing, and using their biometric identifiers and biometric information," in violation of subsection 15(b)(2). *Id.*, ¶ 33 (citing 740 ILCS § 14/15(b)(2)); and that Defendants "never obtained a written release executed by Plaintiff and Class members prior to collecting, capturing, storing, and using their biometric identifiers or biometric information." *Id.*, ¶ 34 (citing 740 ILCS § 14/15(b)(3)); see also [Dkt. 1-1, ¶¶ 63-73 (Count II).]

Count Three claims that Defendants allegedly violated BIPA subsection 15(c) by failing to obtain consent to transfer, disclose, redisclose, or disseminate biometric identifiers and biometric information to other companies within the Charlotte Tilbury Group, as well as vendors, service providers, and other third parties. [See *id.*, ¶¶ 39-40, 43 (citing 740 ILCS § 14/15(c); see also *id.*, ¶¶ 74-81 (Count III).] Count Four claims that Defendants allegedly violated BIPA subsection 15(d) by disclosing and disseminating Plaintiff's biometric information and identifiers without consent (Count IV). [*Id.* ¶¶ 42, 82-89 (citing 740 ILCS § 14/15(d) (Count IV).] Plaintiff seeks "$1,000 for each negligent violation of BIPA" and "$5,000 for each willful and/or reckless violation." [*Id.*, ¶¶ 62, 71, 79, 87.] Finally, Count V is a claim for unjust enrichment that requests injunctive and equitable relief, attorneys' fees, and costs.

On January 6, 2023, Defendants removed the action to this Court. [See Dkt. 1.] Plaintiff filed her motion for remand on March 28, 2023, arguing that Defendants fail to satisfy CAFA's requirement that the amount in controversy exceed $5 million

and that the Court lacks subject matter over her claims for violation of subsections 15(a) and 15(c) of BIPA. [See Dkt. 29.]

## II. Legal Standards

Defendants removed this action to federal court pursuant to CAFA, which was enacted in 2005 "to facilitate adjudication of certain class actions in federal court." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014). "CAFA expands jurisdiction for diversity class actions by creating federal subject matter jurisdiction if: (1) a class has 100 or more class members; (2) at least one class member is diverse from at least one defendant ('minimal diversity'); *and* (3) there is more than $5 million, exclusive of interest and costs, in controversy in the aggregate." *Sabrina Roppo v. Travelers Commercial Ins.*, 869 F.3d 568, 578 (7th Cir. 2017) (citing 28 U.S.C. § 1332(d); *Hart v. FedEx Ground*, 457 F.3d 675, 677 (7th Cir. 2006)).

Defendants, as the parties asserting federal jurisdiction, have "the burden of showing that CAFA's requirements are satisfied." *Schutte v. Ciox Health, LLC*, 28 F.4th 850, 854 (7th Cir. 2022) (citing *Roppo*, 869 F.3d at 578). "To meet this burden, a defendant seeking to remove to federal court must file in the district court a notice of removal 'containing a short and plain statement of the grounds for removal.'" *Roppo*, 869 F.3d at 578 (quoting 28 U.S.C. § 1446(a)). "By design, § 1446(a) tracks the general pleading requirement stated in Rule 8(a) of the Federal Rules of Civil Procedure." *Dart Cherokee Basin Operating Co.*, 574 U.S. at 87 (citing 14C C. Wright, A. Miller, E. Cooper, & J. Steinman, Federal Practice and Procedure § 3733, pp. 639– 641 (4th ed. 2009)). "Congress, by borrowing the familiar 'short and plain statement'

standard from Rule 8(a), intended to 'simplify the pleading requirements for removal' and to clarify that courts should 'apply the same liberal rules [to removals] that are applied to other matters of pleading.'" *Id.*

In this case, Plaintiff objects to removal on the basis that Defendants cannot satisfy CAFA's $5 million minimum amount in controversy requirement. Since Plaintiff contests Defendants' factual allegations concerning the amount in controversy, removal is proper only "if the district court finds, by the preponderance of the evidence, that the amount in controversy exceeds" the jurisdictional threshold. 28 U.S.C. § 1446(c)(2)(B); see also *Schutte*, 28 F.4th at 854; *Blomberg v. Serv. Corp. Int'l*, 639 F.3d 761, 763 (7th Cir. 2011). In determining whether the jurisdictional threshold has been met, the court "evaluate[s] the plaintiff's complaint and the record as a whole as of the time the case was removed." *Janis v. Workhouse Custom Chassis, LLC*, 891 F. Supp. 2d 970, 973 (N.D. Ill. 2012) (citing *Schimmer v. Jaguar Cars, Inc.*, 384 F.3d 402, 404 (7th Cir. 2004)).

Defendants "only must establish the amount in controversy by a good faith estimate that is 'plausible and adequately supported by the evidence.'" *Roppo*, 869 F.3d at 579 (quoting *Blomberg*, 639 F.3d at 763). They "do[] not need to establish what damages the plaintiff will recover, but only how much is in controversy between the parties." *Bloomberg*, 639 F.3d at 763. There are several non-exclusive ways Defendants may meet this burden, including (1) "by calculation from the complaint's allegations"; (2) "by reference to the plaintiff's informal estimates or settlement demands"; and (3) "by introducing evidence, in the form of affidavits from the

defendant's employees or experts, about how much it would cost to satisfy the plaintiff's demands." *Roppo*, 869 F.3d at 579. If Defendants meet their burden, then "remand is appropriate only if the plaintiff can establish the claim is for less than the requisite amount to a 'legal certainty.'" *Id.* (quoting *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 541 (7th Cir. 2006)).

Part of Plaintiff's basis for objecting to removal is that, for two of Plaintiff's BIPA claims, the Court allegedly lacks subject matter jurisdiction. According to Plaintiff, those claims must be remanded and, when their value is subtracted from the total amount in controversy, the total is too low to satisfy CAFA's $5 million threshold, necessitating a remand. Defendants, as the parties invoking federal jurisdiction, bear the burden of showing that Plaintiff had Article III standing at the time of removal. *Collier v. SP Plus Corp.*, 889 F.3d 894, 896 (7th Cir. 2018) (citing *Lujan v. Def. of Wildlife*, 504 U.S. 555, 561 (1992)). Standing must be established for each claim and each form of relief asserted by Plaintiff. *TransUnion LLC v. Ramirez*, -- U.S. --, 141 S. Ct. 2190, 2208 (2021); see also *United States v. Furando*, 40 F.4th 567, 575 (7th Cir. 2022). "If some parts of a single suit are within federal jurisdiction, while others are not, then the federal court must resolve the elements within federal jurisdiction and remand the rest—unless the balance can be handled under the supplemental jurisdiction." *Bergquist v. Mann Bracken, LLP*, 592 F.3d 816, 819 (7th Cir. 2010) (citing 28 U.S.C. §§1367(c)(3), 1441(c)).

## III.  Analysis

The central issue raised by the motion to remand is whether Defendants have satisfied CAFA's $5 million minimum amount in controversy requirement. Defendants take the position that they do through the following calculation: 6 violations of BIPA x 100 putative class members x 2 face scans per class member x $5,000 per violation x 2 Defendants = $12 million.  [See Dkt. 20 at 11-12.][1]

In support of their calculation, Defendants rely on Plaintiff's complaint and a declaration from Jonathan Bush ("Bush"), Isletarr's IT Security & Compliance Manager. Bush states, without elaboration, that based on his review of Charlotte Tilbury records available to date, "the best present estimate is that at least 100 individuals used 'Charlotte's Virtual Try On' tool within the state of Illinois during the five-year period preceding Plaintiff's claims." [Dkt. 1-4, ¶ 5.]

In her motion to remand, Plaintiff challenges four assumptions on which Defendants' calculation of the amount in controversy is based:

1) Each member of the proposed class used the Charlotte's Virtual Try-On tool at least twice;

2) Plaintiff can recover statutory damages for Defendants' violations of subsections 15(b)(1), 15(b)(2), *and* 15(b)(3) of BIPA;

3)  For each face scan in violation of BIPA, Plaintiff can recover against both Defendants; and

---

[1]     Defendants do not assign a value to Plaintiff's unjust enrichment claim, her demand for injunctive relief, or her pre-suit attorneys' fees and therefore the Court does not consider these elements of the complaint in determining whether the $5 million jurisdictional minimum has been satisfied.

4) There is Article III standing for Plaintiff's BIPA § 15(a) and § 15(c) claims. The Court considers each of these arguments in turn and then, based on its conclusions, calculates whether the amount in controversy requirement is satisfied.

## A.    Two scans per class member

Defendants' motion to remand assumes that each of "at least 100 individuals" in Illinois who used Charlotte's Virtual Try-On tool used the tool at least twice. The Court agrees with Plaintiff that this element of Defendants' amount in controversy calculation is not "adequately supported by the evidence." *Roppo*, 869 F.3d at 579.

The complaint does not allege how many times each class member scanned their face using Charlotte's Virtual Try-On tool. It simply defines the proposed class to include "[a]ll individuals whose biometric identifiers and/or biometric information were captured, collected, obtained, stored, used, disclosed, redisclosed, disseminated, sold, traded, or profited from by Defendants through 'Charlotte's Virtual Try On' tool within the state of Illinois any time within the applicable limitations period." [Dkt. 1-1 at 13.] Bush's declaration also does not provide any information concerning how many times each of the "at least 100 individuals" in Illinois who used the tool scanned their faces. Defendant's only basis for assuming that each class member used the tool at least twice is Plaintiff's allegation that she used the tool "[o]n multiple occasions." [Dkt. 1 at 8 (citing Dkt. 1-1, ¶ 4).]

Defendants claim that "[w]here a named plaintiff for a putative class action estimates her individual damages in the complaint, a removing defendant may use that figure as an estimate for determining the amount in controversy for the rest of

the class," and it "then falls on the plaintiff to prove such a recovery is 'legally impossible.'" [Dkt. 30 at 12 (citing *Schutte v. Ciox Health, LLC*, 574 F. Supp. 3d 618, 622 (E.D. Wis. 2021), *aff'd*, 28 F.4th 850, 857 (7th Cir. 2022).] Since Plaintiff alleges that she used the tool multiple times, Defendants assume that each of the Illinois class members used it at least twice, too. Defendants rely exclusively on *Schutte* in support of their argument, but that case did not announce any general rule allowing a removing party to assume that each member of a proposed class must have damages in the same amount as the named plaintiff, where neither the complaint nor the evidence submitted by the non-movant provide any basis for applying that figure to all members of the proposed class.

Although the Seventh Circuit has "acknowledged the difficulty a defendant faces when the plaintiffs, who control the allegations of the complaint, do not want to be in federal court and provide little information about the value of their claims," it nonetheless requires the removing party to use a "good faith estimate" that is both "plausible *and* adequately supported by the evidence" before the burden shifts to the non-movant to show that "the claim is for less than the requisite amount to a legal certainty." *Sabrina Roppo*, 869 F.3d at 579 (emphasis added; internal quotation marks and citations omitted). Speculation is not enough. See *Ware v. Best Buy Stores, L.P.*, 6 F.4th 726 (7th Cir. 2021) (plaintiffs were not entitled to invoke CAFA jurisdiction where "any inference that the amount in controversy exceeds $5 million would be entirely speculative" as plaintiff's complaint and supplemental filings "do not actually make any specific factual allegations or assertions on that point"); *Dancel*

*v. Groupon, Inc.*, 940 F.3d 381, 385 (7th Cir. 2019) (defendants' allegation in notice of removal that some "undetermined number" of class members were "non-Illinois and non-Delaware citizens" was insufficient to satisfy CAFA's diversity requirement, where defendants "rested on … speculation that 'undoubtedly' a class member is a citizen of a state other than Illinois or Delaware"); *Ibarra v. Manheim Investments, Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015) (under CAFA, "a defendant cannot establish removal jurisdiction by mere speculation and conjecture, with unreasonable assumptions"); *Atteberry v. Esurance Ins. Services, Inc.*, 473 F. Supp. 2d 876 (N.D. Ill. 2007) (size of potential class and possibility of recovery in excess of $5 million jurisdictional minimum was too speculative to satisfy CAFA).

*Schutte* did not lower the burden in the manner Defendants urge. The putative class in *Schutte* consisted of plaintiffs who had been overcharged by the defendant for electronic medical records in violation of a Wisconsin statute. *Schutte*, 574 F. Supp. 3d at 620. The evidence in support of the amount in controversy included the complaint's allegations that there were several thousand class members and that plaintiffs sought up to $25,000 in exemplary damages for each violation of the Wisconsin statute, as well as an affidavit from an employee of the defendant, Ciox, stating that "in the six years prior to this case being brought, Wisconsin residents made 727,500 requests for electronic copies of medical records for which they were charged an electronic delivery or archive fee." *Id.* at 622. The district court noted that "[b]ecause Schutte alleges that she was charged $61.23, *defendants argue* that an average recovery of $6.88 in compensatory damages is plausible," *id.* (emphasis

11

added), but the court did not come to a conclusion on whether defendants' argument was, in fact, plausible. It simply concluded that based on the numbers provided by the parties, "defendants have established by a plausible good faith estimate supported by evidence that the amount in controversy exceeds $5 million." *Id.* The average overcharge was ultimately irrelevant, given the large class size and potential exemplary damages, which would put the total amount in controversy into the billions before factoring in any overcharges.

On appeal, the Seventh Circuit affirmed, concluding that the defendant had "satisfied the amount-in-controversy requirement through at least two routes: the allegations in the complaint itself and an affidavit from a Ciox executive." *Schutte*, 28 F.4th at 854. Examining the complaint, the Seventh Circuit reasoned that given the size of the proposed class ("several thousand") and the exemplary damages demand, "2,000 class members would need to recover an average of only around $2,501 in exemplary damages—to say nothing of compensatory damages—to surpass the $5 million threshold." *Id.* at 855. "Or looking at it another way, if each class member's exemplary damages averaged $1,000, a class with only 5,001 members would reach the required total." *Id.* The Seventh Circuit further reasoned that "even if the allegations in the complaint were not enough," Ciox also submitted a declaration that it had "fulfilled about 727,500 relevant requests for medical records in Wisconsin from late January 2015 to late January 2021." *Id.* The Court calculated that "[t]o reach the $5 million threshold on compensatory damages alone, these requests would need to average only around $6.88 in overcharges." *Id.* "Given that Schutte's claimed

compensatory damages" were almost ten times greater—$61—the court concluded that "this estimate is also sufficient to meet Ciox's burden." *Id*. The court rejected the plaintiff's argument that the defendant's "declaration … offers 'no evidence' about the average charge for the 727,500 requests" because, although there is more Ciox could have done to support its estimate, "[a]ll Ciox needed to do at this stage was come forward with a plausible, good-faith estimate that the stakes exceed $5 million, which it did by offering the estimate of 727,500 requests." *Id*.

In this case, the complaint is silent as to how many times each member of the proposed class used the tool. Defendants fail to offer any factual basis for assuming at least two uses per class member. They instead urge the Court to extrapolate Plaintiff's allegation that *she* used the tool on "multiple occasions" to mean that *every* proposed class member *must* have used the tool on multiple occasions. But the Complaint does not allege this, nor does it provide any basis for universally assuming multiple uses by each proposed class member.

Defendants declarant, Mr. Bush, is also silent on topic, though he does offer a factual basis for the total number of potential class members—"at least 100"—a relatively small number that is also the minimum required to confer subject matter jurisdiction under CAFA. Mr. Bush's estimates make the potential compensatory damages recovery of each class member much more important in determining whether the $5 million minimum has been satisfied. Assuming each class member used the tool twice would potentially double the amount in controversy from $6

million to $12 million—a difference that could be dispositive if the Court accepts any of Plaintiff's other criticisms of how Defendants calculated the amount in controversy.

Given the critical importance of the assumption that each class member used the tool at least twice, and the lack of plausible allegations or evidence supporting it, it is not reasonable for Defendants to base their amount-in-controversy calculations on the assumption that every proposed class member used the tool twice. This portion of Defendants' calculation is too speculative to support removal and the Court will assume only one scan per class member in calculating the amount in controversy. See, e.g., *Ibarra*, 775 F.3d at 1197 (in former employees' proposed class action against employer for denial of meal and rest breaks in violation of the California Labor Code, employer failed to establish that CAFA's $5 million minimum was met where, despite the complaint's allegations of a "pattern or practice" of labor law violations, employer was merely speculating that such violations occurred each and every shift); *Pazol v. Tough Mudder Inc.*, 819 F.3d 548, 555–56 (1st Cir. 2016) (defendant organizers of obstacle course, who were sued by event participants under Massachusetts' Consumer Protection Act after event was moved to a different city, failed to show there was a reasonable probably that amount in controversy satisfied CAFA's $5 million minimum based, in part, on additional lodging expenses incurred by event participants, where defendants "provide[d] no support for the conclusion that the predicate assumptions underlying their estimate of lodging expenses are reasonably probable ones").

## B.    Recoveries under subsections 15(b)(1), 15(b)(2), and 15(b)(3) of BIPA

Defendants' motion to remand assumes that for each face scan using Charlotte's Virtual Try-On tool, Plaintiff is seeking statutory damages for violations of subsection 15(b)(1), subsection 15(b)(2), *and* subsection 15(b)(3) of BIPA. Plaintiff argues that this inappropriately "triple count[s]" Count II of the complaint because "Plaintiff does not allege multiple causes of action under § 15(b)" but rather "Count II alleges only one § 15(b) cause of action." [Dkt. 29 at 12.] In support of her position, Plaintiff relies on an Illinois pleading rule, 735 ILCS 5/2-603(b), which provides that "[e]ach separate cause of action upon which a separate recovery might be had shall be stated in a separate count or counterclaim, as the case may be and each count … shall be separately pleaded, designated, and numbered, and each shall be divided into paragraphs numbered consecutively, each paragraph containing, as nearly as may be, a separate allegation."

Plaintiff's position, however, is inconsistent with the complaint's allegations and not compelled by Illinois pleading rules. The complaint plainly alleges violations of three separate subparts of BIPA § 15(b). [See Dkt. 1-1, ¶ 66 (§ 15(b)(1)); ¶ 67 (§ 15(b)(2); ¶ 68 (§ 15(b)(3)).] According to Count II of the complaint, Defendants collected her and other class members' biometric information in a manner that:

- violated § 15(b)(1) by failing to "inform[] Plaintiff and the other Class members … in writing that their biometric identifiers and biometric information were being collected and stored" [Dkt. 1-1, ¶ 66];
- violated § 15(b)(2) by failing to "inform[] Plaintiff and the other Class members, or their legally authorized representatives, in writing of the specific purpose and length of term for which the biometric identifiers

and biometric information was being collected, stored and used" [*id.*, ¶ 67]; and

- violated § 15(b)(3) by failing to "first obtain[] a written release" [*id.*, ¶ 68].

The complaint seeks "statutory damages of $5,000 pursuant to 740 ILCS § 14/20(2) for *each* intentional and reckless violation of BIPA, or alternatively statutory damages pursuant to 740 ILCS § 14/20(1) of $1000 for *each* negligent violation." [Dkt. 1-1, ¶ 73 (emphasis added).]

The Court agrees with Defendants that the natural reading of these allegations is that Plaintiff is seeking damages for three subsection 15(b) violations rather than a single violation. Nor is the Court convinced that Illinois pleading rules—to the extent they are applicable at all—require reading Count II in the manner urged by Plaintiff. It is true that Illinois is a fact-pleading jurisdiction, which requires a plaintiff to "allege facts sufficient to bring a claim within a legally recognized cause of action"—for example, "negligence" or "willful and wanton misconduct." *Quiroz v. Chicago Transit Authority*, -- N.E.3d --, 2022 WL 4372898, at *3 (Ill. Sup. Ct. Sept. 22, 2022); see also *Doe v. Coe*, 135 N.E.3d 1, 12 (Ill. Sup. Ct. 2019). But Plaintiff has not cited any case law indicating that each subpart of subsection 15(b) (or a comparable statute) creates a separate "cause of action" that must be pleaded separately. In contrast, Defendants cite one case in which the court counted "three Section 15(b) violations" for purposes of calculating amount in controversy under CAFA, even though the complaint included all three violations in a single count. See *Burlinski v. Top Golf USA Inc.*, Case No. 19-cv-6700, 2020 WL 5253150, at *3 (N.D. Ill. Sept. 3, 2020); Dkt. 1-1 at 9-11.

In this case, the complaint pleads violations of all three subparts of § 15(b), and Plaintiff has not shown that it would be "legally impossible" to recover under all three subparts, so the Court will include all three in calculating the amount in controversy.

## C. Two Defendants

The next assumption on which Defendants' amount in controversy calculation is based is that Plaintiff is seeking to recover from each Defendant for each face scan. [Dkt. 30 at 11-12.] In response, Plaintiff does not disclaim her ability to collect from both Defendants but merely criticizes Defendants for "provid[ing] no basis" for their position that they could both be held liable for the same violations. [Dkt. 31 at 11.]

Defendants have met their initial burden of proof by relying on the complaint. See *Roppo*, 869 F.3d at 579 (defendants can meet burden to show amount in controversy "by calculation from the complaint's allegations"). Each count of the complaint is brought against both Defendants and seeks damages and injunctive relief against both. Further, Plaintiffs have not shown that recovery against both Defendants would be "legally impossible." *Schutte*, 574 F. Supp. 3d at 622. While neither party cites or discusses applicable case law, the Court's own research indicates that under BIPA, "each entity's violation gives rise to a claim; a plaintiff does not incur one, indivisible injury (e.g., a broken leg or lost cargo) caused by multiple defendants, but many individual injuries at the hands of many individual defendants who violated BIPA." *Johnson v. NCR Corp.*, 2023 WL 1779774, at *3 (N.D. Ill. Feb. 6, 2023); see also *Figueroa v. Kronos Inc.*, 454 F. Supp. 3d 772, 787 (N.D. Ill.

2020) (third-party vendor could be held liable under BIPA "even if [the alleged] violations occurred simultaneously or through use of the same equipment" as those of the plaintiff's employer). Therefore, the Court will count both Defendants in calculating the amount in controversy.

### D. Article III Standing

Plaintiff argues that Defendants' amount in controversy calculation should not include her claims under subsections 15(a) and 15(c) of BIPA because Plaintiff does not have standing under Article III of the U.S. Constitution to bring those claims in federal court. Article III "limits the jurisdiction of federal courts to cases and controversies." *Pucillo v. Nat'l Credit Sys., Inc.*, -- F. 4th --, 2023 WL 3090627, at *2 (7th Cir. Apr. 26, 2023). To establish standing, "[a] plaintiff must have (1) a concrete and particularized injury in fact (2) that is traceable to the defendant's conduct and (3) that can be redressed by judicial relief." *Pierre v. Midland Credit Management, Inc.*, 29 F.4th 934, 937 (7th Cir. 2022).

### 1. BIPA § 15(a)

Section 15(a) of BIPA requires a private entity in possession of biometric identifiers or information to "develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying [the biometrics] when the initial purpose for collecting [them] has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first." 740 ILCS 14/15(a).

18

Several recent Seventh Circuit decisions address Article III standing to bring a BIPA § 15(a) claim in federal court. In *Bryant v. Compass Group USA, Inc.*, the Seventh Circuit held that the plaintiff did not have Article III standing to bring her § 15(a) claim because "[i]n contrast to the obligations set forth under section 15(b), the duty to disclose under section 15(a) is owed to the public generally, not to particular persons whose biometric information the entity collects" and the plaintiff "allege[d] no particularized harm that resulted from [the defendant's] violation of section 15(a)." *Bryant,* 958 F.3d 617, 626 (7th Cir. 2020).

A few months later, in *Fox v Dakkota Integrated Sys., LLC*, the Seventh Circuit clarified that a plaintiff had Article III standing to bring a § 15(a) claim where she "allege[d] a concrete and particularized invasion of her privacy interest in her biometric data stemming from [defendant's] violation of the full panoply of its section 15(a) duties—the duties to develop, publicly disclose, *and comply with* data retention and destruction policies—resulting in the wrongful retention of her biometric data . . ." 980 F.3d 1146, 1149 (7th Cir. 2020) (emphasis in original); see also *King v. PeopleNet Corp.*, 2021 WL 5006692, at *3 n.3 (N.D. Ill. Oct. 28, 2021) ("collection or retention without a policy is a particularized harm to a plaintiff.").

The question before this Court is whether Plaintiff's § 15(a) allegations are more like those in *Bryant* or more like those in *Fox*. Defendants claim that Plaintiff alleges both a failure to develop a retention policy and a failure to comply with a retention policy and, therefore, Article III's standing requirement is satisfied.

The Court first considers the allegations concerning the development of a retention policy. In the "factual allegations" section of her complaint, Plaintiff includes a section heading titled "Defendants Failed to Develop and Publish Policies for the Retention and Permanent Destruction of Plaintiff and Class Members' Biometric Data." [Dkt. 1-1 at 10]. In the second paragraph of that section, the complaint alleges that Defendants "failed to develop a written policy, made available to the public, that establishes a retention schedule and guidelines for permanently destroying the biometric identifiers and/or biometric information of Plaintiff and Class members." [Dkt. 1-1, ¶ 37.] In Count I, Plaintiff alleges that "[i]n violation of 740 ILCS § 14/15(a), Defendants, while in possession of Plaintiff's and the Class members' biometric identifiers and biometric information, failed to develop a written policy made available to the public providing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information as required by that provision." [Dkt. 1-1, ¶ 58.]

Defendants argue that these allegations suffice to show that Plaintiff is suing because "Defendants failed to develop a retention policy" (like in *Fox*) *not* simply because Defendants failed to make such a policy publicly available (like in *Bryant*). Arguably, Plaintiff's section heading creates some ambiguity by using the conjunctive "and" in the phrase "Defendants Failed to Develop and Publish any policy …" [Dkt. 1-1 at 10.] But this standing alone is insufficient to establish standing, as "an important corollary to the rule that injury-in-fact must be both concrete and particularized … is the requirement that 'the plaintiff must clearly allege facts

20

demonstrating each element.'" *Thornley v. Clearview AI, Inc.*, 984 F.3d 1241, 145-46 (7th Cir. 2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

When the complaint's section heading is read in context with the specific allegations of Count I and the allegations of the complaint as a whole, the Court concludes that Plaintiff's § 15(a) claim is more like the one at issue in *Bryant*. See *United States v. Pace*, 48 F.4th 741, 754 (7th Cir. 2022) (complaint must be read as a whole rather than as "a series of unrelated and isolated provisions"). Plaintiff's Section 15(a) claim arises from allegations that Defendants failed to publish the requisite retention and destruction policies—not from allegations that Defendants additionally failed to *develop* any policy.

For instance, in paragraph 46 of the complaint, Plaintiff alleges that Defendants did not "*publish* any policy specifically about the collection, retention, use, deletion, or dissemination of [biometric] information" or "any policy as to a biometric retention schedule or guidelines for permanently destroying biometrics." [Dkt. 1-1, ¶ 46.] In paragraph 51(e), Plaintiff lists as one common question of fact for the proposed class "[w]hether Defendants established a *publicly available* policy for retention of biometric identifiers and biometric information sufficient to satisfy 740 ILCS § 14/15(c)". [*Id.*, ¶ 51(e) (emphasis added)]. And in paragraph 59, Plaintiff alleges that Defendants "failed to develop a written policy *made available to the public* providing a retention schedule and guidelines for permanently destroying biometric identifiers." [*Id.* (emphasis added).] In sum, Plaintiff alleges "a mere *generalized* harm arising from the retention-policy violation" by alleging that

Defendants' "failure to *publish* a data retention schedule and destruction policy violates Section 15(a)." *Woods v. FleetPride, Inc.*, 2022 WL 900163, at *5 (N.D. Ill. Mar. 27, 2022); see also *King*, 2021 WL 5006692, at *4 (defendant failed to establish Article III standing for plaintiff's § 15(a) claim where, among other things, plaintiff "didn't claim that defendant had no biometric information policy").

Defendants also argue that there is standing for Plaintiff's § 15(a) claim based on the complaint's allegations that Defendants have "unlawfully retained" Plaintiff's and the proposed class members' biometric identifiers. [Dkt. 30 at 6.] Defendants rely broadly on the complaint's allegations that Defendants "capture, collect, use, and store" her biometric data. [*Id.* (citing Dkt. 1-1, ¶¶ 23-35, 38-43, 82-89).] But none of the cited allegations accuse Defendants of retaining Plaintiff's or the class members' data in violation of Defendants' retention schedule: Paragraphs 23 through 35 of the complaint describe how Defendants' technology works and how Defendants have violated § 15(b) (for which there is no dispute concerning standing). Paragraphs 38 through 43 describe how Defendants transferred or disclosed biometrics to third parties, without any mention of a data retention or destruction policy. And paragraphs 82 through 89 allege a violation of § 15(d); these paragraphs also come after and are not incorporated by reference into the § 15(a) claim. Therefore, the Court accepts Plaintiff's position that her complaint contains "no allegations that Defendant unlawfully retained the Plaintiff's data after the initial purpose for collection had ended." [Dkt. 29 at 15.]  See, e.g., *Kislov*, 566 F. Supp. 3d at 914 (no Article III standing for § 15(a) claim that did not allege that defendant "unlawfully retained

[plaintiffs'] biometrics"); *Marquez v. Google LLC*, 2020 WL 6287408, at *2 (N.D. Ill. Oct. 27, 2020) (no standing for BIPA § 15(a) claim where "[n]owhere does the Complaint address compliance with mandated BIPA § 15(a) policies or deletion requirements").

In sum, the Court concludes that the § 15(a) claim in this case "mirrors *Bryant*, not *Fox*," because Plaintiff "has alleged a mere *generalized* harm arising from the retention-policy violation." *Woods*, 2022 WL 900163, at *5. Here, like in *Bryant*, there are no allegations that Defendants unlawfully retained Plaintiff's data after the initial purpose for collection had ended, or that Defendants had no data retention or destruction policy or failed to comply with their policy. Read as a whole, the § 15(a) claim challenges Defendants' "failure to *publish* a data retention schedule and destruction policy," which "is not an issue of compliance beyond publication, and that makes all the difference" under Seventh Circuit precedent. *Woods*, 2022 WL 900163, at *5. Therefore, the Court lacks subject matter jurisdiction over the § 15(a) claim and will not include that claim in calculating the amount in controversy under CAFA.

### 2.    BIPA § 15(c)

Section 15(c) of BIPA provides that "[n]o private entity in possession of a biometric identifier or biometric information may sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information." The Seventh Circuit's recent decision in *Thornley*, 984 F.3d 1241, addresses Article III standing for BIPA § 15(c) claims. The plaintiff in that case, seeking to avoid removal of her § 15(c) claim, defined the proposed class to include Illinois citizens "who

suffered no injury from Defendant's violation of Section 15(c) of BIPA other than statutory aggrievement …." *Thornley*, 984 F.3d at 1246. The Seventh Circuit held that removal was improper and remanded to the district court. The appellate court explained that section 15(c) creates a "general rule that prohibits the operation of a market in biometric identifiers and information." *Id*. Without any "allegations of concrete and particularized harm to the plaintiffs," a claim that defendant violated section 15(c) is insufficient to establish Article III standing. *Id*. It noted that a plaintiff might have a section 15(c) claim if, for example, the plaintiff asserted "that by selling her data, the collector has deprived her of the opportunity to profit from her biometric information"; "that the act of selling her data amplified the invasion of her privacy that occurred when the data was first collected, by disseminating it to some unspecified number of other people"; or "that the scraping of data from social media sites raises the cost of using those sites in some respect." *Id*. at 1247.

With these examples in mind, the Court has reviewed the complaint's allegations in support of the § 15(c) claim and concludes that Article III standing is lacking. Plaintiff does not allege that Defendants have injured her in any discernable way that violates § 15(c). She does not allege that she was deprived "of the opportunity to profit from her biometric information" or that "that the act of selling her data amplified the invasion of her privacy that occurred when the data was first collected, by disseminating it to some unspecified number of other people." *Thornley*, 984 F.3d at 1247. Rather, the complaint's allegations surrounding § 15(c) focus on how Defendants "commercially benefited" from the dissemination of the data

"because this commercial dissemination assists Defendants with business development, data analytics and consumer advertising." [Dkt. 1-1, ¶ 43.]

The only allegation that Defendants point to in support of their contrary reading of the complaint is paragraph 92, which alleges that Plaintiff and members of the proposed class were "expos[ed] . . . to a heightened risk of privacy and informational harms" and "depriv[ed] . . . of control over their biometric data[.]" *Id.* ¶ 92. Paragraph 92 is pled in support of Plaintiff's claim for unjust enrichment (Count V). The § 15(c) claim comes before the unjust enrichment claim and does not incorporate by reference any of its allegations. While calculated pleading choices may be viewed as gamesmanship, the Seventh Circuit recognized that some plaintiffs "t[ake] care in their allegations …. to steer clear of federal court" and that, "in general, plaintiffs may do this," so long as their "allegations are in good faith." 984 F.3d at 1248. They may "take advantage of the fact that Illinois permits BIPA cases that allege bare statutory violations, without any further need to allege or show injury." *Id.* at 1248-49 (citing *Rosenbach v. Six Flags Entertainment Corp.*, 129 N.E.3d 1197 (Ill. Sup. Ct. 2019)).

Plaintiff, as "the master of her own complaint," *Thornley*, 984 F.3d at 1246, has chosen not to predicate her § 15(c) claim on the allegation that she was deprived of the opportunity to profit from her data, or that defendants amplified the initial particular and concrete harms by disseminating the data. The mere fact that Defendants allegedly sold, traded, leased or otherwise profited from it is insufficient to confer Article III standing, and the Court lacks subject matter jurisdiction over

25

this claim. *See Thornley*, 984 F.3d at 1247; *Johnson v. Mitek Systems, Inc.*, 55 F.4th 1122, 1124 (7th Cir. 2022) ("Johnson has not alleged a concrete harm and, on [][the Section 15(c)] claim at least, seeks only statutory damages," necessitating remand).

### E.    Calculation of Amount in Controversy

In summary, Plaintiff's BIPA claims under §§ 15(a) and 15(c) must be remanded due to lack of Article III standing, leaving 4 violations of BIPA. Defendants have not offered any evidence in support of using two as the number of times each putative class member scanned their face using the Charlotte's Virtual Try On tool. The Court will use one, the minimum necessary to fall within the proposed class consisting of "all individuals whose biometric identifiers and/or biometric information were captured, collected, obtained, stored, used disclosed, redisclosed, disseminated, sold, traded, or profited from by Defendants through" the tool. [Dkt. 1-1, ¶ 48.] These two changes to the calculation take the amount in controversy below CAFA's $5 million minimum: 4 violations of BIPA x 100 putative class members x 1 face scan per class member x $5,000 per violation x 2 Defendants = $4 million. Therefore, the entire action must be remanded for failure to satisfy CAFA's removal requirements.

## IV.    Conclusion

For these reasons, Plaintiff's motion to remand [Dkt. 29] is granted. This matter will be returned to the Cook County Circuit Court. Civil case remanded.

Enter: 23-cv-94
Date:  May 11, 2023

_____
Lindsay C. Jenkins
United States District Judge

26